FIRST DEPARTMENT, JUNE, 1933.

MINNIE ROUSAK and PAUL ROUSAK, Respondents, *v.* ROSE RUDNICK, Appellant.*

Judgment reversed as to both plaintiffs and a new trial ordered, with costs to the appellant to abide the event, unless plaintiff, Minnie Rousak stipulates to reduce the judgment as entered in her favor to the sum of $7,685.36, and plaintiff, Paul Rousak, stipulates to reduce the judgment as entered in his favor to $1,000, in which event the judgment as so modified is affirmed, without costs. No opinion. Present — Finch, P. J., Merrell, Martin, O'Malley and Townley, JJ.; Martin, J., dissents and votes to reverse and grant a new trial. Settle order on notice.

MARTIN, J. (dissenting). The plaintiffs sue to recover damages for personal injuries sustained by Minnie Rousak and for loss of services by her husband Paul Rousak. Minnie Rousak, who was twenty-five years of age at the time of the accident, resided with her husband and family in the basement of premises, No. 1261 Commonwealth avenue, The Bronx. She testified that on April 19, 1929, at about ten A. M., she was walking down the concrete stairs leading to her apartment, placing her hand lightly on the railing; when she reached about the fourth step, which was in the middle of the stairway, her left foot slid in a hole where the stairway was defective and she fell very heavily, striking her back on the steps. The plaintiff was taken into her home and Dr. Levine was called. He treated her every day thereafter for three weeks. At the end of that period she still complained of pain in the lumbar region of her back and the doctor ordered her to a hospital. On May 10, 1929, she went to the clinic of the Hospital for Joint Diseases, where a diagnosis was made of an injury to the vertebral column. An X-ray diagnosis confirmed her injury as being a compression fracture of the third lumbar vertebrae. On July 17, 1929, she was admitted to the Hospital for Joint Diseases and further X-rays were taken which disclosed fractures of the second and third lumbar vertebrae and a fracture of the coccyx and a curvature of the spine, due to the compression fracture of the vertebrae. On the trial of this action the plaintiff sought to conceal the fact that she had a prior accident. She was asked several questions on that subject and denied that she had ever had a prior accident. It was disclosed, however, on cross-examination, that in the year 1921, the plaintiff either fell or jumped from a second story window and received severe injuries as a result of which she was confined in Bellevue Hospital for several months. Dr. Landsman, an experienced doctor, who is conceded to be an able expert, read in evidence the records of the X-rays taken in 1921 in Bellevue Hospital. He testified that the reading of those X-rays showed a curvature of the spine, injury to the vertebrae and tuberculosis of the spine. It is thus disclosed that a part, if not all, of the injuries for which plaintiff is now attempting to recover from the owner of the property on whose stairway she claims to have been injured were present in 1921. The witness went into minute details and established that practically all these injuries to the spine, with the exception of the claimed fracture of the vertebrae, were discovered in Bellevue Hospital

---

* Affd., 263 N. Y. 682.

in 1921, and that the most serious matter shown at that time was that the plaintiff was suffering from tuberculosis of the spine. Dr. Landsman testified, as follows: (Fol. 446.) " Q. All right. I direct your attention to the hospital records of one Minnie Krinsky, and ask you to tell us when she was in the hospital at Bellevue, what date to what date? A. She was admitted July 22, 1921. She was discharged September 9, 1921." (Fol. 447.) " Q. There were X-rays taken of Miss Krinsky while she was at the hospital. * * * A. Yes, two sets, one on August 30, 1921, and the other three days later, September 2, 1921." (Fol. 449.) " Q. What is stated in the record as to the findings on those two sets of X-rays? A. August 30, 1921, the patient was referred to the X-ray Department at Bellevue Hospital from the ward with a clinic diagnosis of scoliosis of the spine. That means that the ward doctor said that she had a curvature of the spine and asked for an X-ray examination." This question was stricken out by the judge but the witness was allowed to answer as follows: (Fol. 451.) "A. August 30, 1921, clinic diagnosis, scoliosis of the spine. No evidence of fracture of the lower dorsal or lumbar vertebrae. Second examination, September 2, 1921, clinic diagnosis tuberculosis of spine, moderate sclerosis at the second lumbar intra-vertebral space with obliteration of the left half of this space indicating an old, destructive spondylitis." (Fols. 452–454.) " Q. Will you tell us what scoliosis of the spine is? A. Scoliosis of the spine means curvature of the spine. Q. Can you tell us, in your opinion, with reasonable certainty as to whether curvature of the spine is something that takes place overnight or is it a matter of years coming? Is it a development that is a matter of years? A. It is a matter of years. The period of duration depends on the extent of the scoliosis. Q. Scoliosis of the spine, you told us, is tuberculosis of the spine. A. No. Q. What is scoliosis of the spine? A. Curvature of the spine. Q. Tuberculosis of the spine, what does that mean? A. That means a disease of the bone, a tubercular disease of the bone. Q. Moderate sclerosis at the second lumbar. Will you explain what is meant by that? A. Sclerosis means a change in the — a change from the normal condition of the bone, the bone becomes harder, sclerosis means harder." (Fol. 462.) " Q. Referring to plaintiff's exhibit — A. Wait a minute. Let me get through —the intra-vertebral space between these two bodies is obliterated. This bone is half the size (indicating). In addition to this there is a bony bridge, this portion here (indicating), a new piece of bone has been formed extending across the bodies in the front, between the second and third lumbar (indicating). This contains new bone and forms a bridge across the spaces." With respect to his findings, Dr. Landsman then made this very significant statement: (Fols. 486, 487.) " Q. Assuming all of the hypothetical assumptions, plus what Mr. Harrington narrated just now, can you say, in your opinion, with reasonable certainty, whether such an accident — that is, the one that happened in 1921, would be a competent producing cause of the condition disclosed in the findings Exhibits 2 to 16? * * * (Objections thereto overruled). A. Yes. Q. What is your opinion? A. My opinion is that she had this condition when she had her fall. Q. Which fall? A. 1921. (Objection taken to the answer). * * * The Court: Are you sure that you appreciate what the question asked you was? The Witness: Yes. The Court: You were asked whether on these assumptions you were able to say whether, with reasonable certainty, the original fall was a competent producing cause of the injury shown on the X-rays which you have examined. Mr. Thompson: Yes. The Court: Are you able to

answer that question? The Witness: Yes. The Court: Do so, yes or no. The Witness: Yes, it is." In the face of this evidence, the jury rendered a large verdict, evidently attributing all of the injuries to the latter accident, when substantially all should have been attributed to the former accident. It would be shocking to permit this verdict to stand, although substantially reduced, Not only was there deliberate perjury by the plaintiff in concealing the prior accident but in other respects, especially with reference to the injuries. It is not an answer to a case of this kind to say the verdict may be reduced, which reduction is a mere guess on the part of anyone endeavoring to dispose of this matter in such an arbitrary manner. The verdict is against the overwhelming weight of the evidence, especially in view of the documentary evidence which shows conclusively that practically all the injuries complained of were received many years before the accident alleged in this action. To permit a verdict of this kind to stand would encourage perjury in personal injury actions. It is my opinion that the only way justice may be done in an action of this character is to reverse and have it properly retried, at which time the defendant will be able to produce as witnesses doctors whose services she was unable to secure because of the conduct of the plaintiff. The judgment should be reversed and a new trial ordered, with costs to appellant to abide the event.